COURT OF APPEALS

EIGHTH DISTRICT OF TEXAS

EL PASO, TEXAS




MAURO ARTURO IBARRA,


 Appellant,


v.



THE STATE OF TEXAS,


 Appellee.
§


 


§


 


§


 


§


 


§


 


 § 


No. 08-05-00207-CR



Appeal from the


409th Judicial District Court


of El Paso County, Texas 


(TC# 20040D00650) 



O P I N I O N


 Mauro Arturo Ibarra was indicted for capital murder. The jury found him guilty of the
lesser-included offense of manslaughter and the trial court assessed punishment at 20 years'
imprisonment. In six issues, he challenges the legal and factual sufficiency of the evidence and
asserts jury charge error, trial court's comment on the weight of evidence, the denial of his
pretrial motion to suppress, and trial court refusal to allow him to make a full and complete
opening statement. We affirm.

 In August 2003, Luis Villarreal went to the home of his employee Arturo Escobedo when 
Mr. Escobedo failed to show up for work. Mr. Villarreal opened the unlocked screened wrought-iron door and saw broken ceramic pieces on the ground between the wrought-iron door and the
wooden front door. He then opened the unlocked front door and saw Mr. Escobedo lying on the
floor, dead.

 El Paso Police Officers Manuel Gomez and Calvin Green were the first officers to arrive
at the scene. After Officer Gomez spoke with Mr. Villarreal outside the house, they looked
through the front window of the residence and saw a body lying face-down on the floor with his
hands tied. The officers decided to call for back-up. When Officers Hisa, Torres, and Diaz, and
Sergeant Lockhart arrived, the four officers entered the residence with their weapons drawn,
looking for other victims and suspects. As the officers cleared the residence, they stepped on the
debris, including a coffee table, that was covering the floor. Crime Scene Unit technicians who
later collected evidence recalled observing the disarray and signs of a struggle, including broken
pieces of a vase and glass items, and a table that had been crushed under some pressure. The
victim was found hog-tied and his head was face-down in a small, black pillow or cushion and a
knife was found underneath the victim's body. An iron without its cord was located between the
living room and bedroom on the floor.

 Dr. Corinne Stern, Chief Medical Examiner for El Paso County, performed the autopsy of
Mr. Escobedo on August 26. She observed that Mr. Escobedo's body was in an advanced state
of decomposition. She also observed that Mr. Escocedo had been hog-tied, with his hands bound
behind his back at the wrists and the same cord looped around his ankles, which caused his feet
to be turned up. After removing the cord ligature binding the victim's wrists and ankles,
Dr. Stern examined the skin and found no evidence of hemorrhage, which meant Mr. Escobedo
was probably dead at the time he was hog-tied or he was unconscious and did not struggle. The
doctor's external examination also revealed that the victim had a laceration to his forehead that
was caused by blunt force injury. The victim had a laceration on the palm surface of the right
hand at the ring finger. Dr. Stern determined that the hand injury could have been caused by
blunt force or it could have been a defensive wound from deflecting a knife.

 Dr. Stern also found a hemorrhage on the left testicle, which was caused by blunt force
trauma, most likely a kick in the groin. Dr. Stern also found a massive diffuse subgaleal
hemorrhage on both sides of the victim's head and underneath the whole back of the scalp. 
According to Dr. Stern, the subgaleal hemorrhage was caused by the victim being struck in the
head with something or his head struck against something. The head injuries were consistent
with a hand or foot holding the head down or with blunt force trauma, such as a blow from a
vase.

 Based on her investigation of the scene, the position of the victim's body being hog-tied
where he was not able to move his head, and the autopsy, Dr. Stern concluded that the victim
died from asphyxiation due to suffocation and the manner of death was homicide. Dr. Stern
agreed that the subgaleal hemorrhage was consistent with the victim's head being held into a
pillow and forced down while the victim tried to push himself up in the fight. Dr. Stern testified
that a person placed in the hog-tied prone position on the stomach would create a type of
respiratory distress, to which a person would succumb in less than two minutes if his head was
down in a pillow. According to Dr. Stern, a pillow is a deadly weapon when a person's head is
placed into a pillow and suffocated. Likewise, Dr. Stern opined that if an electrical cord is used
to create a situation where a person cannot move and his head is in a pillow and that person
suffocates, the electrical cord would be a deadly weapon.

 On cross-examination, Dr. Stern testified that this was not a positional asphyxia case, that
is, where the victim is just hog-tied, with no external pressure or force on the body and dies
because he is not able to breathe in that position. Dr. Stern did not know if most people know
about the breathing problems associated with hog-tying a person or the possibility of death
occurring depending on the person's position. She guessed that someone could have absolutely
no idea that hog-tying another person could cause the person's death, but to her it was common
sense--separate from her medical knowledge. Dr. Stern agreed that bruising on the lips or around
the nose can happen when a person's face is compressed into a pillow, but stated that most of the
time it does not. The doctor also stated that just because there was not this type of bruising in
this case, did not mean Mr. Escobedo was not suffocated. Dr. Stern testified that the subgaleal
hemorrhage was consistent with someone being held down, but agreed that it was also consistent
with someone hitting his head on a shelf, a coffee table, or a wall during a struggle. With regard
to the testicular hemorrhage, Dr. Stern noted that it was fresh and very consistent with the injury
happening around the time of the victim's death. Dr. Stern agreed that it was possible that if
someone tied up another person who was unconscious, placed a pillow underneath that person's
head with the head to the side so he could breathe, but that person who was in an altered mental
status could have, nevertheless, rolled his head and blocked his own breathing and caused his
death. Dr. Stern could not rule out that scenario, but concluded that would still be a suffocation
and still a homicide.

 Several police officers testified about the physical evidence they collected at the victim's
residence, which was later sent to the Department of Public Safety (DPS) lab for DNA testing.
Specifically, officers collected strands of hair found on the victim's shirt, a clump of hair found
underneath the black pillow, the kitchen knife found underneath the victim's body, a bloody
sock, a blue shirt, a hat, the black pillow, two candlestick holders, towels, and other items. In
addition, blood swabs were taken of blood found on the floor next to the victim's head, on the
sofa and loveseat, on the blinds, on the floor, on a table, on the iron, and the front door. Blood
samples, hair, and fiber evidence were taken from the knife. Blood samples were taken from the
candlestick holders.

 Crime scene technicians also collected latent prints at the residence. Specifically, the
officers lifted fingerprints from glass vase fragments, a VHS porn tape, the bathroom doorknob,
photo envelope cover, the shelving, the doorknob of the exterior front wooden door, the
bathroom door, interior door surface, and the iron. Later, officers lifted fingerprints from the
victim's vehicle, which was recovered from Juarez.

 Officer Doug Lloyd, the State's expert fingerprint analyst, testified that he processed
fifty-nine prints found at the scene. Only twenty-six were of evidentiary value. Officer Lloyd
matched three prints found on the iron, vase fragments, and the bathroom doorknob to Appellant. 
Officer Lloyd matched five prints found on the shelving unit, the photo envelope, a shoe box, and
a candlestick holder to the victim. Officer Lloyd had at least five other usable prints that did not
match any of the fingerprints of other people to which he was asked to compare. These
unidentified usable prints included a blood print found on the iron and on the interior of the front
door below the door handle and a latent print from the bathroom doorknob. Thirteen of the
twenty-six prints recovered from the victim's vehicle were of evidentiary value. However,
Officer Lloyd was unable to link the vehicle prints of value to anyone, including Appellant.

 Armando Soto Morales was a friend of Mr. Escobedo and was familiar with
Mr. Escobedo's car, which Mr. Escobedo had recently bought. On the evening of August 22,
2003, Mr. Morales was driving towards Juarez when he noticed Mr. Escobedo's vehicle traveling
in the same direction. As he caught up to the vehicle, he noticed that someone else was driving
it. He passed the vehicle but kept close watch in his rearview mirror, thinking that someone
might have stolen it. The driver was very concentrated and focused on driving. Once he crossed
into Juarez, Mr. Morales lost sight of the car. On August 28, 2003, he identified Appellant in a
photo-line up as the individual he saw driving Mr. Escobedo's car. At trial, he identified
Appellant in the courtroom as the same person he saw driving Mr. Escobedo's car.

 Detective Jesus Terrones, with the Crimes Against Persons ("CAP") Section, worked as
the facilitator in the exchange of information between the El Paso Police Department and the
Mexican authorities. Detective Terrones contacted the Mexican Judicial Police Office for
assistance in interviewing Appellant, a Mexican citizen, as part their investigation of
Mr. Escobedo's death. Two state judicial agents escorted Detectives Terrones, Ochoa, and
Sameniego, unarmed, to Appellant's house in Mexico. Detective Ochoa introduced himself to
Appellant and displayed his badge. He informed Appellant that he was from the City of El Paso
in the United States and was investigating an incident that occurred there. The detective asked
Appellant if he would be willing to meet with him in El Paso and Appellant said that would be
fine. Appellant asked his wife to bring a change of clothing, but when she brought out certain
items, he told her "not those." The state agents, however, confiscated the items, which included
a pair of jeans with suspected blood stains. Appellant then changed into a second set of clothing,
before he was escorted by Mexican officials to the homicide office in Mexico.

 Detective Terrones then contacted an INS official to secure a permit for Appellant's entry
into the United States because Appellant informed the detectives that he had lost or misplaced his
resident alien card or visa. As the detectives spoke with Appellant, they noticed that he spoke
English. Appellant explained that he lived in El Paso a long time and attended Riverside High
School up to his sophomore year. At the Paso del Norte port of entry, they waited about an hour
for the necessary paperwork. Appellant was not handcuffed and was not told he was under
arrest. According to Detective Terrones, if Appellant had told the detectives that he did not want
to go to the United States, he would not have gone. Rather, they specifically told him that he did
not have to go with them.

 Once in El Paso, Appellant was taken to the CAP office and escorted to a cubicle. 
Appellant was offered something to drink and use of the restroom, but he declined. Detective
Ochoa issued the Miranda warnings to Appellant in both English and Spanish. Appellant then
read the Miranda warning card out-loud in both languages. Appellant then initialed next to each
right to indicate that he understood each right. Appellant also signed the card. Detective Ochoa
then asked Appellant if he was willing to talk about a serious case under investigation, and
Appellant said sure, yes. During the interview, which lasted twenty to thirty minutes, Detective
Ochoa asked questions about an incident that occurred on Dale Road. At some point during the
interview, the detective informed Appellant about Mr. Escobedo's death. Once Appellant
finished providing information, he voluntarily agreed to give a statement. According to
Detective Ochoa, Appellant was not coerced or threatened, and at no time did Appellant request
to speak with an attorney or to cease the interview. He also never directly or indirectly promised
Appellant anything in return for giving the statement. Detective Ochoa testified that during the
interview and prior to giving the statement, he informed Appellant of his right to contact the
Mexican consulate's office.

 Appellant's statement taken on September 2, 2003 was admitted into evidence. In his
statement, Appellant said he was walking to his brother's house after crossing the Paso del Norte
Bridge, when some guy, later known to be Mr. Escobedo, approached him in his car. After
asking Appellant for directions to a certain street, Mr. Escobedo asked Appellant if he would go
with him to help him look for the street. Appellant agreed because the area Mr. Escobedo was
looking for was close to where his brother lives. As they were traveling, Mr. Escobedo started to
touch Appellant's stomach and asked Appellant to raise his shirt because he wanted to see if
Appellant was fat and whether he was wearing boxer shorts. Mr. Escobedo offered to pay
Appellant if Appellant allowed him to "go down" on him. At first, Appellant said no, but then he
thought about how he needed the money and agreed to go to a house, which was located on Dale
Street. Mr. Escobedo offered Appellant some juice and then turned on a pornographic movie. 
They were sitting in the living room on the couch. Mr. Escobedo pulled out a twenty-dollar bill
and Appellant proceeded to take off his shorts. Mr. Escobedo removed Appellant's socks and
shoes. While Mr. Escobedo engaged in oral sex, he told Appellant "he was going to take
something from me and keep it as a trophy." After ejaculating, Appellant told Mr. Escobedo to
move back and noticed that Mr. Escobedo appeared upset. Appellant quickly got dressed and
made his way to the front door.

 According to Appellant, Mr. Escobedo pulled out a kitchen knife from his back pocket
and threatened to cut off his penis. Scared, Appellant grabbed a bronze flower vase and told
Mr. Escobedo to back off. Appellant did not see the knife as Mr. Escobedo came towards him. 
Mr. Escobedo grabbed Appellant's penis and his other hand reached towards his back pocket.
Thinking Mr. Escobedo was reaching for the knife, Appellant hit Mr. Escobedo on the head with
the vase. The vase broke and Appellant continued to hit Mr. Escobedo with his fist. 
Mr. Escobedo continued to grab Appellant's penis as they wrestled on the ground. Eventually,
Appellant grabbed the knife from Mr. Escobedo's back pocket with his left hand and struck
Mr. Escobedo in the head with it. Appellant did this several times while he continued to punch
Appellant with his right fist. Mr. Escobedo released Appellant's penis after he appeared to be
fainting. They both fell on a glass table and Mr. Escobedo was out after they landed. Worried
that Mr. Escobedo would get up and continue to hurt him, Appellant decided to tie him up. 
Appellant located an iron in the kitchen, placed it on the floor, and ripped the cord off. Appellant
used the iron's cord to tie Mr. Escobedo's hands and feet together. Appellant knew
Mr. Escobedo was not dead because Mr. Escobedo pled for help and told him his head hurt. 
Appellant told Mr. Escobedo that he would not help him because he had tried to cut off his penis
and kill him. Appellant took Mr. Escobedo's jewelry, his car, and house keys, and then left in
Mr. Escobedo's car. Appellant later left the car in a store parking lot and pawned the jewelry and
items he found in the car. In his statement, Appellant said he was questioned about a pillow that
was found next to Mr. Escobedo's head, but he did not know anything about it.

 Appellant was arrested after he made his statement and photographed. The photographs
show lacerations, redness, and abrasions on Appellant's body, in particular on his legs and his
arm. Appellant submitted a DNA sample. DNA testing results showed that of the physical
evidence obtained at Mr. Escobedo's residence, blood found on a brown and white towel, a hat,
paper towel, a blue shirt, and a knife were consistent with the victim's DNA profile. 
Specifically, blood found on the blade and handle of the knife were consistent with
Mr. Escobedo's DNA profile. One of the socks recovered matched both the DNA of
Mr. Escobedo and Appellant. The DNA profile of another towel found at the residence was
consistent with a mixture of Appellant and an unknown male. The black pillow tested negative
for semen. The pillow appeared to be soaked in blood, but the DNA analyst did not conduct
further tests on it. Blood stains found on the couch, glass shelving unit, and floor were consistent
with Mr. Escobedo's DNA profile. The blood stains on Appellant's jeans tested positive for
Appellant's blood. Hair analysis showed that: the fibers from the kitchen knife were animal
hairs; the fifteen hairs found on the victim's shirt were visually dissimilar to the victim's head
and pubic hair and to Appellant's head and pubic hair; and the clump of hair found under the
black pillow was visually similar to the victim's head hair and visually dissimilar to Appellant's
head hair.

 Lawrence Renner, a crime scene reconstructionist, testified on behalf of the defense. 
With regard to the crime scene at Dale Road, Mr. Renner was critical about the police
department's methods of recovering and preserving the evidence. Specifically, one of the crime
scene technicians attempted to photograph a shoe print, but did not attempt to lift it with an
electrostatic dust print lifter. Mr. Renner noted that there were four different areas on a door that
they identified as being separate blood-letting events, but the police only sampled one of the
areas for DNA analysis. The police failed to take photographs of a print lifted from a piece of a
broken vase or to note from which piece the print was lifted. Mr. Renner also thought the police
should have collected the vase pieces and put the pieces together in order to determine where on
the object the print was located. He criticized the DPS laboratory for not testing various blood
samples taken from the scene. Mr. Renner also believed the lack of a videotape of Appellant's
statement affected his ability to do a proper reconstruction, as well as the various unidentified
photographs that were located within the residence. Mr. Renner also faulted the DNA analyst for
failing to conduct DNA tests on epithelial cells on items such as the electrical cord and the sock. 
Based on the information collected, Mr. Renner was not able to come up with an accurate,
complete reconstruction of the crime scene.

Standards of Review

 In reviewing the legal sufficiency of the evidence, we must view the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); Vodochodsky v. State, 158 S.W.3d 502, 509
(Tex.Crim.App. 2005). The trier of fact is the sole judge of the weight and credibility of the
evidence. Margraves v. State, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000). In conducting our
review, we may not re-evaluate the weight and credibility of the evidence and substitute our
judgment for that of the fact finder. King v. State, 29 S.W.3d 556, 562 (Tex.Crim.App. 2000);
Dewberry v. State, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Any inconsistencies in the
evidence are resolved in favor of the verdict. Curry v. State, 30 S.W.3d 394, 406
(Tex.Crim.App. 2000).

 In reviewing the factual sufficiency of the evidence, we must determine whether
considering all the evidence in a neutral light, the jury was rationally justified in finding guilt
beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex.Crim.App. 2004),
overruled on other grounds by Watson v. State, 204 S.W.3d 404 (Tex.Crim.App. 2006).
Evidence can be factually insufficient if the evidence supporting the verdict, considered by itself,
is too weak to support the finding of guilt beyond a reasonable doubt, or contrary evidence is so
strong that guilt cannot be proven beyond a reasonable doubt. Id. at 484-85. Our evaluation,
however, should not intrude upon the fact finder's role as the sole judge of the weight and
credibility given to any witness's testimony. See Cain v. State, 958 S.W.2d 404, 407
(Tex.Crim.App. 1997). We will not set aside the judgment unless the evidence supporting the
verdict is so weak as to be clearly wrong and manifestly unjust. Zuniga, 144 S.W.3d at 481. A
clearly wrong and manifestly unjust verdict occurs where the jury's finding "shocks the
conscience" or "clearly demonstrates bias." Id. An opinion addressing factual sufficiency must
include a discussion of the most important and relevant evidence that supports the appellant's
complaint on appeal. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Manslaughter

 Appellant was convicted of the lesser-included offense of manslaughter. The Texas
Court of Criminal Appeals has recently held that a defendant is not estopped from challenging
the legal and factual sufficiency of the evidence where he is found guilty of a lesser-included
offense not related to the sudden-passion element of voluntary manslaughter. See McKinney v.
State, 207 S.W.3d 366, 374 (Tex.Crim.App. 2006). A person commits the offense of
manslaughter if he recklessly causes the death of another. See Tex.Pen.Code Ann. § 19.04(a)
(Vernon 2003). A person acts recklessly with respect to circumstances surrounding his conduct
or the result of his conduct when he is aware of but consciously disregards a substantial and
unjustifiable risk that the circumstances exist or the result will occur. See Tex.Pen.Code Ann.
§ 6.03(c)(Vernon 2003). The risk must be of such a nature and degree that its disregard
constitutes a gross deviation from the standard of care that an ordinary person would exercise
under all the circumstances as viewed from the actor's standpoint. Id. Under the court's charge,
the jury was authorized to convict Appellant of manslaughter if it determined that he recklessly
caused Mr. Escobedo's death by either suffocating him with a pillow or by binding his hands and
feet together behind his back with an electrical cord while he laid on his stomach, causing
Mr. Escobedo to suffocate.

 The evidence in this case shows that Mr. Escobedo was found dead on the floor in his
living room with his hands and feet bound together with an electrical cord, lying on his stomach,
with his head face-down in a pillow. Broken pieces of pottery, glass, and blood-covered items,
indicated signs of a struggle or fight. Because of the condition of the skin underneath the ligature
binding the victim's wrists and ankles, Dr. Stern believed Mr. Escobedo was probably dead or
unconscious when he was hog-tied. Dr. Stern found a massive diffuse subgaleal hemorrhage on
both sides of the victim's head and underneath the whole back of the scalp. According to
Dr. Stern, this injury was consistent with a hand or foot holding victim's head down into a pillow
and forced down while the victim tried to push himself up. Based on the autopsy and the
circumstances at the scene, in particular, the victim's body being in a hog-tied position and
unable to move his head, Dr. Stern concluded that Mr. Escobedo died from asphyxiation due to
suffocation.

 Police officers found physical evidence that connected Appellant to the crime scene. 
Specifically, the police matched three prints found on the iron, vase fragments, and the bathroom
doorknob to Appellant. Appellant's DNA profile matched blood samples from one of the socks
and a towel found in the residence. An eyewitness also identified Appellant as the individual he
saw driving Mr. Escobedo's car into Juarez on the evening of August 22, 2003.

 Appellant gave a voluntary statement on September 2, 2003, in which he admitted that he
accompanied Mr. Escobedo to his house and engaged in a consensual sex act. However,
according to Appellant, Mr. Escobedo became upset, threatened him with a kitchen knife, and
attacked him. During the struggle, Appellant hit Mr. Escobedo with the knife and his fist. 
Appellant admitted that he tied Appellant up, but he believed Mr. Escobedo was not dead
because he pleaded for help and told Appellant his head hurt. Appellant denied having any
knowledge about the pillow located near the victim's head.

 Appellant claims that the evidence was insufficient because the evidence did not show
that hog-tying or pillow suffocation recklessly caused Mr. Escobedo's death. Even if the
evidence was insufficient to the State's theory on hog-tying as the cause of death, from the direct
and circumstantial evidence presented, the jury could have rationally concluded beyond a
reasonable doubt that Appellant was the actor who pushed Mr. Escobedo's head into a pillow
with his hand or foot while Mr. Escobedo was restrained and unable to move, that Appellant
perceived this substantial and unjustifiable risk, but consciously disregarded it, and therefore his
conduct was reckless in that it resulted in Mr. Escobedo's death by suffocation. Appellant,
however, points out that Dr. Stern agreed it was possible that placing the victim's head on a
pillow caused the victim's death by accident. However, Dr. Stern also stated that under those
circumstances, the death would still have been due to suffocation and still a homicide.

 Next, Appellant argues that the evidence was insufficient to show Appellant recklessly
caused the victim's death because the grand jury did not know how the deceased died. 
Specifically, Appellant notes testimony from a grand juror, in which she testified that the grand
jury was unable to determine what deadly weapon was used to cause the victim's death. The
indictment, however, alleged alternative theories of the manner and means by which Appellant
recklessly caused Mr. Escobedo's death, including by suffocation with a pillow. Even if the
grand jury did not know what deadly weapon was used to cause the death, the jury at trial was
presented evidence from which it could rationally conclude that Appellant recklessly caused
Mr. Escobedo's death by pillow suffocation.

 In addition, Appellant faults the State for failing to explain the physical evidence that was
not linked to either Appellant or Mr. Escobedo and the numerous persons in the sexually explicit
photographs who had some unknown motive, but were never fully investigated. Specifically,
Appellant argues that the evidence did not exclude the reasonable doubt that someone other than
Appellant caused Mr. Escobedo's death. The State, however, is not required to disprove every
other reasonable hypothesis than guilt of the defendant. See Geesa v. State, 820 S.W.2d 154, 161
(Tex.Crim.App. 1991), overruled on other grounds by Paulson v. State, 28 S.W.3d 570
(Tex.Crim.App. 2000).

 Finally, Appellant complains that the investigation was not complete to the point where
confidence in the outcome cannot be said to meet the requirements of due process. With regard
to Appellant's complaints concerning the police officers' investigation of certain evidence, the
record shows the following: (1) the police found an individual's Mexican voter identification
card in Mr. Escobedo's bedroom, however, neighbors who were canvassed did not place the
individual in the photograph with Mr. Escobedo on the day of his death; (2) Appellant admitted
to taking Mr. Escobedo's car and an eyewitness saw Appellant driving it, therefore it was
unnecessary to match unidentified fingerprints on the victim's car; (3) the unidentified footprint
could have been caused by Officer Calvin Green when he entered the residence, searching for
other victims and potential suspects; (4) Officer Velez believed there were blood prints on the
interior front door, but he did not use Luminol to test them because leaching is very high, and he
also noted there were numerous areas of blood at the scene and thus, it was impractical to take
samples of all of them; (5) contrary to Appellant's assertions, DNA tests were performed on both
the blade and the handle of the knife; (6) the pillow was tested for semen, but it was obviously
blood-soaked with the victim's blood and thus, not probative for DNA analysis; (7) only head
and pubic hair were compared to the unidentified hairs found at the scene; and (8) Officer
Samaniego testified that they were unable to locate the individuals shown in sexually explicit
photographs found in Appellant's residence and regardless, there was no match with the
composite sketch of the potential suspect. After reviewing all the evidence concerning the police
investigation, the evidence does not support Appellant's contention that there was an inadequate
or "slipshod" investigation in this case.

 Viewing the evidence in the light most favorable to the verdict, we conclude the evidence
was legally sufficient to sustain Appellant's conviction for manslaughter. Further, after viewing
all the evidence in a neutral light, and contrary to Appellant's numerous contentions addressed
above, we conclude the evidence was factually sufficient because the evidence was not too weak
to support the finding of guilt beyond a reasonable doubt nor was contrary evidence so strong
that guilt could not be proven beyond a reasonable doubt. Accordingly, Issues One and Two are
overruled.

 In Issues Three and Four, Appellant argues the trial court erred in charging the jury as to
the law of self-defense so as to place the burden of proof on Appellant and in so doing, the trial
court improperly commented on the weight of the evidence.

 When an appellant alleges jury charge error on appeal, our first task is to determine
whether error actually exists in the charge. Hutch v. State, 922 S.W.2d 166, 170 (Tex.Crim.App.
1996); Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). If there is jury charge
error, we must then determine if the error caused sufficient harm to warrant reversal. Hutch, 922
S.W.2d at 170-71; Almanza, 686 S.W.2d at 171. If the error in the charge was the subject of a
timely objection, reversal is required if there is some harm to the defendant as a result of the
error. Hutch, 922 S.W.2d at 170-71; Almanza, 686 S.W.2d at 171. When the defendant fails to
object or states that he has no objection to the charge, we will not reverse for jury-charge error
unless the record shows "egregious harm" to the defendant. Hutch, 922 S.W.2d at 170-71;
Almanza, 686 S.W.2d at 171. Because Appellant did not object to the charge on self-defense, he
must show he suffered egregious harm.

 In this case, the court's charge to the jury included the following general instruction on
self-defense:

 If evidence of self-defense has been raised, the state is required to disprove
self-defense beyond a reasonable doubt, but does not expressly have to refute the
defendant's self-defense evidence.


In each application paragraph for self-defense, the charge stated:

 [I]f you have a reasonable doubt thereof, or, you further believe from the
evidence, that at the time he did so the defendant reasonably believed that the
deceased, ARTURO ESCOBEDO was then and there committing or attempting to
commit an aggravated assault upon him, and to prevent the imminent commission
of such aggravated assault upon his person, and that a reasonable person in
Defendant's situation would not have retreated, then you will find the Defendant
not guilty and you shall acquit the Defendant MAURO IBARRA of [the charged
offense].


On appeal, Appellant asserts that the words "but does not expressly have to refute the
Defendant's self-defense evidence" erroneously shifted the burden of proof to the defense. 
Appellant surmises that this language is a distillation of the legal sufficiency test for the jury's
rejection of a self-defense claim, which he argues indulges in presumptions about the veracity of
witnesses and inferences drawn to support the State that a jury cannot be told to make.

 Section 9.31 of the Texas Penal Code provides for self-defense as a justification for a
defendant's conduct. See Tex.Pen.Code Ann. §§ 9.31, 9.02 (Vernon 2003). If the issue of the
existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on
the issue requires the defendant be acquitted. Tex.Pen.Code Ann. § 2.03(d)(Vernon 2003). As
the Texas Court of Criminal Appeals explained in Saxton v. State, Section 2.03(d) arguably
imposes a burden on the State to directly refute a defense raised at trial, however, the case law
indicates that the State has the burden of persuasion in disproving the evidence of self-defense,
that is, not the burden of production, "i.e., one which requires the State to affirmatively produce
evidence refuting the self-defense claim, but rather a burden requiring the State to prove its case
beyond a reasonable doubt." Saxton v. State, 804 S.W.2d 910, 913 (Tex.Crim.App. 1991). We
conclude that the charge on self-defense did not shift the burden to the defense. Rather, the
complained-of general instruction was a correct statement of the law, which informed the jury
that the State did not have the burden of production, in other words, the State did not have to
affirmatively, that is, not expressly, produce evidence refuting the self-defense claim, but rather it
had the burden of persuasion to disprove self-defense beyond a reasonable doubt. Contrary to
Appellant's assertions, the instruction merely addresses the burden of the State and in no way
instructs the jury to consider presumptions that apply in a sufficiency review of the jury's implicit
rejection of that claim on appeal. See Saxton, 804 S.W.2d at 914 (in resolving the sufficiency of
the evidence issue, we determine whether after viewing all the evidence in a light most favorable
to the verdict, any rational trier of fact would have found the essential elements of the offense
beyond a reasonable doubt and also would have found against appellant on the self-defense issue
beyond a reasonable doubt).

 Appellant also asserts that the complained-of language is a comment on the weight of the
evidence in violation of Article 36.14 of the Texas Code of Criminal Procedure. A trial court
may not comment on the weight of the evidence in the charge. See Tex.Code Crim.Proc.Ann.
art. 36.14 (Vernon 2007). In determining whether the charge comments on the weight of the
evidence, we review the charge as a whole rather than as a series of isolated statements. Whaley
v. State, 717 S.W.2d 26, 32 (Tex.Crim.App. 1986). A trial court improperly comments on the
weight of the evidence if it makes a statement that implies approval of the State's argument,
indicates any disbelief in the defense's position, or diminishes the credibility of the defense's
approach to its case. Clark v. State, 878 S.W.2d 224, 226 (Tex.App.--Dallas 1994, no pet.).

 Appellant argues that by instructing the jury that the State can win without refuting the
defendant's evidence, the trial judge is saying that un-refuted evidence of self-defense is
somehow not a reasonable doubt. Appellant claims that this is a "wink" to the jurors, telling
them that they do not have to believe the defendant's self-defense evidence and if they do not
believe it, or have a doubt, then the State can be permitted to win. Appellant's argument,
however, ignores the complete sentence, which clearly sets out the State's burden to disprove
self-defense beyond a reasonable doubt, without having to expressly refute the defendant's claim. 
We conclude that the complained-of instruction was a correct statement of law, and therefore was
not error. Moreover, we conclude the trial court did not comment on the weight of the evidence
by including this instruction. Issues Three and Four are overruled.

 In Issue Five, Appellant contends the trial court erred in not suppressing his statement
because he was not advised of his right to consult with a consular agent of his nationality. 

 We review the trial court's ruling on a motion to suppress for an abuse of discretion. 
Guzman v. State, 955 S.W.2d 85, 88-9 (Tex.Crim.App. 1997). Under this standard, we give
almost total deference to the trial court's determination of historical facts supported by the
record, especially when the findings are based on an evaluation of credibility and demeanor. Id.
at 89. We review de novo mixed questions of law and fact that do not turn on an evaluation of
credibility and demeanor. Id.; Balentine v. State, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002). 
The trial court's ruling will be upheld if it is reasonably supported by the record and is correct on
any theory of law applicable to the case. State v. Ross, 32 S.W.3d 853, 855-56 (Tex.Crim.App.
2000).

 "The Vienna Convention on Consular Relations grants a foreign national who has been
arrested, imprisoned or taken into custody a right to contact his consulate and requires the
arresting government authorities to inform the individual of this right 'without delay.'" Rocha v.
State, 16 S.W.3d 1, 13 (Tex.Crim.App. 2000), quoting Maldonado v. State, 998 S.W.2d 239,
246-47 (Tex.Crim.App. 1999)(citing Vienna Convention on Consular Relations, April 24, 1963,
art. 36(1)(b), 21 U.S.T., 77, 100-101, 595 U.N.T.S. 261, 292 (ratified by the United States on
Nov. 24, 1969)). In Rocha, the Texas Court of Criminal Appeals held that the exclusionary rule
under Article 38.23 of the Texas Code of Criminal Procedure does not provide a remedy for
violations of treaties, including the Vienna Convention. Rocha, 16 S.W.3d at 18-9. Additionally,
the United States Supreme Court has recently held that even assuming the Vienna Convention
grants individuals enforceable rights, suppression under the federal exclusionary rule is not an
appropriate remedy for a violation of the Convention. Sanchez-Llamas v. Oregon, 126 S.Ct.
2669, 2677-82,165 L.Ed.2d 557 (2006). Given this clear precedent, we conclude the trial court
did not abuse its discretion in denying Appellant's motion to suppress his statement. Issue Five
is overruled.

 In Issue Six, Appellant argues the trial court erred in not permitting a full and complete
opening statement by the defense. Specifically, Appellant complains that because of the trial
court's restriction, he was prohibited from getting before the jury that when he was questioned
about the crime, he had told the officers he was not guilty and they did not put that into his
statement.

 We review the trial court's decision to restrict Appellant's opening statement for an abuse
of discretion. See Norton v. State, 564 S.W.2d 714, 718 (Tex.Crim.App. 1978). A defendant is
entitled to present an opening statement to the jury. See Tex.Code Crim.Proc.Ann.
art. 36.01(b)(Vernon 2007). The purpose of an opening statement is to communicate to the jury
the party's theory of the case in order to aid the jury in evaluating and understanding the evidence
as it will be presented. See Twine v. State, 970 S.W.2d 18, 19 (Tex.Crim.App. 1998)
(McCormick, J., concurring); McGowen v. State, 25 S.W.3d 741, 747 (Tex.App.--Houston [14th
Dist.] 2000, pet. ref'd). However, the character and content of opening statements are subject to
the trial court's discretion. Norton, 564 S.W.2d at 718. Thus, the trial court has "the judicial
discretion to control the statement and limit it to its proper scope" and ensure the accused "does
not seek to abuse the privilege by commenting upon improper or inadmissible facts, converting it
into argument, or otherwise misusing it . . . ." Dugan v. State, 82 Tex.Crim. 422, 424, 199 S.W.
616, 617 (Tex.Crim.App. 1917); see also Moore v. State, 868 S.W.2d 787, 793 (Tex.Crim.App.
1993)(precluding the defendant from stating matter inadmissible in evidence is not trial court
error).

 Here, the record shows that Appellant filed a motion in limine, asking the trial court to
instruct the State to refrain from making any mention or reference to any oral or written
statements made by him, without first appropriating the bench. Likewise, the State filed a
motion in limine requesting that Appellant refrain from making any mention concerning his
written statements, without first appropriating the bench. Prior to trial, the court heard the State's
motion in limine and granted the State's request that Appellant refrain from mentioning his
written statement in his opening statement because the State had not yet decided to put it into
evidence and thus, it remained hearsay evidence. Specifically, the trial court held that it was
granting the State's motion in limine with regard to this request, "until such time as it is offered
by a party to which it is not hearsay. So at this point, it won't be allowed during opening
statement." The trial court then extended its ruling to oral statements made by Appellant to the
detectives, which had previously been excluded by Appellant's motion to suppress.

 After the indictment was read and Appellant pled not guilty, the State gave an opening
statement, without mentioning Appellant's oral or written statements to the police. Appellant's
counsel then presented his opening statement, stating that he expected the evidence to show
Appellant was present in Mr. Escobedo's residence and that during a struggle between the two
men, Mr. Escobedo attacked Appellant and each was injured, but that the police investigation
was inadequate and they failed to exclude several potential suspects that could have committed
the actual murder. Appellant's counsel did not make any references to Appellant's oral or
written statements.

 Four days later, Appellant's counsel moved for the court's permission to complete his
opening statement, reminding the trial court that its ruling on the State's motion in limine was
based on the State indicating that it was not sure whether it was going to put Appellant's
statement into evidence. However, since the State's next witness was to be Detective Ochoa,
Appellant's counsel asserted that he should be allowed to complete the opening statement prior
to the detective being able to testify about the statement. The trial court responded that the
Appellant's statement remained hearsay to Appellant until the State decided whether or not to put
it into evidence, therefore the court's ruling remained the same. The trial court then denied
Appellant's request to complete an opening statement.

 During the State's direct examination of Detective Ochoa, it proffered Appellant's written
statement and Detective Ochoa read it before the jury. Appellant did not re-urge his opening
statement request. Rather, during extensive cross-examination of Detective Ochoa about the
taking of the statement, Appellant's counsel elicited testimony that nowhere in the statement did
Appellant admit to pushing Mr. Escobedo's head into a pillow, strangling, suffocating, or
otherwise killing Mr. Escobedo. Rather, the statement only admitting to getting into a fight with
Mr. Escobedo, Mr. Escobedo threatening Appellant and attacking him, and Appellant responding
to the attack. Detective Ochoa also agreed that Appellant told him while taking the statement
that when he left, Mr. Escobedo was alive.

 During closing argument, Appellant's counsel mentioned the statement, stating:

 Now, you also heard the officer testify as to the statement that was made,
and on cross-examination, you heard the officer, Oh, no, I didn't put that in there. 
Well, did he say it? Oh, yeah. Is it in the statement? Oh, no, it's not there.


 Was that truthful? Did they give you the whole truth? Was that statement
that they claim came from the Defendant the whole truth? I submit to you, during
cross-examination, you found out they were selecting what they wanted, to feed
you their version of the facts.


 Anything that helped the Defendant was left out, especially when he said, I
did not kill him, he was alive when I left. That was not on the confession.


 After reviewing the record, we find that while Appellant initially objected to the
restrictions placed on the content of his opening statement, he nevertheless failed to preserve his
complaint for review by presenting a timely objection, that is, once the State introduced his
written statement into evidence during Detective Ochoa's testimony, Appellant should have
objected because the basis for the trial court's initial ruling no longer existed. Appellant failed to
make his request to complete his opening statement known to the trial court once it became
apparent that the State did intend to admit his written statement into evidence. Therefore, we
conclude Appellant has not preserved this complaint for review. See Tex.R.App.P. 33.1; see also
Dunn v. State, 819 S.W.2d 510, 525 (Tex.Crim.App. 1991)(right to present an opening statement
may be waived by failing to make a timely request and simply acquiescing to the trial court's
action). Issue Six is overruled.

 We affirm the trial court's judgment.




August 30, 2007

 DAVID WELLINGTON CHEW, Chief Justice


Before Chew, C.J., McClure, and Carr, JJ.


(Do Not Publish)